UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

R&F ORANGE, LLC,                                    Civil Action No.

          Plaintiff,

vs.

DANIEL GILBRIDE AND BRIAN GILBRIDE,                 JUNE 4, 2026

          Defendants.

## COMPLAINT

R&F Orange, LLC ("Plaintiff"), by its undersigned attorneys, brings its Complaint against Daniel Gilbride and Brian Gilbride (collectively as "Defendants") and alleges as follows:

## Nature of the Action

1.      In this action, Plaintiff seeks to recover damages of no less than $1,979,518.91 from Defendants, who are guarantors under the Lease (as hereinafter defined) between Plaintiff and Orange Swim School, LLC d/b/a Goldfish Swim School Orange ("Tenant"). After Plaintiff expended significant time, money and resources pursuant to the Work Letter (as defined in the Lease), Tenant, through its counsel Daniel Daniluk, informed Plaintiff that Tenant intended to disengage from the Lease and would not perform its obligations thereunder, constituting an anticipatory breach of the Lease. Despite Plaintiff's repeated demands for a retraction of that repudiation and unambiguous assurances of performance, Tenant provided none, and its repudiation is final. Plaintiff now seeks its damages from Defendants, who agreed to be liable for said damages under the Guaranty (as hereinafter defined).

20569983 v2
10346085.v1

- 2 -

## The Parties

2.     At all times relevant to this action, Plaintiff is and has been a New York limited liability company with its principal office at 7248 Morgan Road, Liverpool, New York 13088.

3.     Upon information and belief, Daniel Gilbride is an individual who resides at 11442 W. Roxbury Place, Littleton, Colorado 80127.

4.     Upon information and belief, Brian Gilbride is an individual who resides at 1061 Nicholson Avenue, Lakewood, Ohio 44107.

5.     Daniel Gilbride and Brian Gilbride, collectively, are hereinafter referred to as "Defendants."

## Jurisdiction and Venue

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.     This Court has personal jurisdiction over Defendants because they conduct business in the State of Connecticut, and the claims asserted herein arise out of such business.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims set forth herein occurred in this district, including the negotiation of the underlying lease and guaranty.

10346085.v1

**Statement of Facts**

**A.      The Lease.**

9.      Plaintiff and Tenant entered into a Shopping Center Lease (the "Original Lease") dated as of the 17th day of September, 2024 for approximately 7,551 square feet of space at 538 Boston Post Road, Orange, Connecticut (the "Demised Premises").

10.      The "Permitted Use" of the Demised Premises (as defined in the Original Lease) was solely as and for the operation of a Goldfish Swim School, specializing in providing swim lessons for babies and young children.

11.      The Permitted Use was highly specialized and unique, and had never previously been operated at the Demised Premises. As a direct result of the unique nature of the Permitted Use, Landlord's Work (as hereinafter defined) required significant design, engineering, permitting, and pre-construction work (collectively, "Design and Engineering") specifically tailored to Tenant's specifications. The Design and Engineering work for Tenant's unique use are of little to no value for any alternative retail tenant or purpose.

12.      The Original Lease had an Initial Term of fifteen (15) years, commencing on the earlier of (i) the date Tenant opened for business in the Demised Premises, or (ii) two hundred seventy (270) days after the Delivery Date (as defined in Section 2.1(b) of the Original Lease) (the "Rent Commencement Date"), subject to certain extensions, and terminating on January 31 of the year immediately following the 15th anniversary of the Rent Commencement Date (the "Expiration Date").

13.      Pursuant to Section 6.9 of the Lease, Tenant agreed to open the Demised Premises for business no later than one hundred eighty (180) days after the Rent Commencement Date, and to conduct business there at least four (4) days per week. Tenant's obligation to open for

- 3 -

business, and to construct and complete Tenant's Work (as hereinafter defined) as a predicate thereto, were material obligations of Tenant, and were unconditionally guaranteed by Defendants under the Guaranty.

14.    Under the Original Lease, Tenant agreed to pay Fixed Annual Rent as follows:

| Lease Years | Rent Per S/F | Monthly Rent | Annual Rent |
|:---:|:---:|:---:|:---:|
| 1-5 | $16.50 PSF | $10,382.63 | $124,591.50 |
| 6-10 | $18.15 PSF | $11,420.89 | $137,050.65 |
| 11-15 | $19.97 PSF | $12,566.12 | $150,793.47 |

15.    Tenant further agreed to pay Additional Rent to Plaintiff, including Tenant's proportionate share of taxes and common area expenses, among other charges.

16.    The Original Lease contained a self-operative termination provision pursuant to which it would automatically terminate if the parties did not complete certain open items ("Open Items") within a specified period. The parties were unable to complete the Open Items and thus the Original Lease automatically terminated on October 15, 2024.

17.    However, the parties entered into a Reinstatement and Amendment to Shopping Center Lease on October 29, 2024 (the "Reinstatement"), pursuant to which the parties reinstated and amended the Original Lease, and expressly agreed that the Open Items had been completed.

18.    Under the Original Lease, as reinstated, upon default by Tenant, Plaintiff could elect to recover damages from Tenant in one of two forms: (i) a sum representing the then

value (discounted at 5% per annum) of the aggregate of the Fixed Annual Rent and the Additional Rent that would have been payable by Tenant through the Expiration Date, or the aggregate rental value of the Demised Premises for the same period; or (ii) the Fixed Annual Rent and Additional Rent as it comes due through the Expiration Date, credited against any rents actually received by Plaintiff from any re-letting of the Demised Premises.

19.     Under either election by Plaintiff above, Tenant is also required to pay the costs and expenses of terminating the Lease, re-entering and securing possession of the Demised Premises, and re-letting, including altering and preparing the Demised Premises for new tenants, brokers' commissions and reasonable attorneys' fees, rent concessions, and all other expenses properly chargeable against the Demised Premises and the rental thereof.

20.     The Original Lease, as amended in the Reinstatement, and subsequently amended by Letter Agreements dated July 25, 2025 and September 30, 2025, is hereinafter collectively referred to as the "Lease".

21.     The Lease provided for a Contingency Period (as defined in the Lease) during which Tenant retained the right to terminate the Lease if Tenant was unable to obtain the permits required to perform Tenant's Work.

22.     The Lease imposed significant work obligations on both parties. Plaintiff was obligated to perform Landlord's Work as a condition precedent to delivery of the Demised Premises to Tenant, and Tenant was obligated to thereafter perform Tenant's Work – defined under the Lease as all work, other than Landlord's Work, necessary for Tenant's occupancy of the Demised Premises, including the installation of a swimming pool, at its sole cost and expense.

23.     "Landlord's Work" is described in Exhibit B to the Lease and required Plaintiff, among other things, to prepare the Demised Premises for Tenant's unique use, including

excavation of the pool area to specific depths and dimensions, subgrade compaction, groundwater management, structural and mechanical work, and delivery of a white box space – all uniquely tailored to Tenant's specifications and of little to no value for any alternative retail tenant or purpose.

24.     On January 22, 2026, Tenant's Director of Construction, Ron Bevilacqua, notified Plaintiff in writing via email that Tenant had received its building permit, a copy of which was attached to his email, and satisfied all contingencies under the Lease.

25.     Because Tenant had satisfied all contingencies under the Lease, Tenant became fully and irrevocably bound by all of its obligations thereunder and no longer had the right to terminate the Lease or otherwise avoid performance thereunder.

**B.     The Guaranty.**

26.     On September 17, 2024, Defendants executed a joint and several Guaranty of Lease (the "Guaranty").

27.     The Guaranty is attached as Exhibit H to the Lease.

28.      As a condition to entering into the Lease, Plaintiff required that Defendants execute the Guaranty. To induce Plaintiff to enter into the Lease, Defendants executed the Guaranty and agreed to be bound by all of its terms and conditions.

29.     Pursuant to the Guaranty, Defendants unconditionally guaranteed all of Tenant's obligations under the Lease including, without limitation, the obligation to pay Fixed Annual Rent and Additional Rent.

30.     The Guaranty also required Defendants to perform all Tenant's other obligations if Tenant defaulted in the performance or observance thereof.

- 6 -

10346085.v1

31.     Pursuant to Section 6 of the Guaranty, Defendants' obligations specifically apply to the construction and completion of Tenant's Work, the opening for business from the Demised Premises for its Permitted Use, as well as all of Tenant's obligations during the first three (3) years of the Initial Term of the Lease. Thereafter, commencing on the fourth (4th) Lease Year, the Guaranty continues on a rolling basis covering twelve (12) months of Tenant's obligations at any given time.

32.     The Guaranty is enforceable directly against Defendants without the necessity of any prior suit against Tenant or prior notice of default.

## C. **Tenant Breached the Lease.**

33.     As hereinabove set forth, all Tenant Contingencies under the Lease were satisfied as confirmed by Tenant in writing on January 22, 2026, at which point Tenant became fully and irrevocably bound by all of its obligations under the Lease and retained no right to terminate or otherwise avoid performance thereunder.

34.     Pursuant to the Lease, as amended by the Letter Agreement dated September 30, 2025, the Anticipated Delivery Date was the later of (i) six (6) months from the date Tenant satisfied or waived the Tenant Contingencies, or (ii) June 1, 2026. Because Tenant satisfied all Tenant Contingencies on January 22, 2026, the Anticipated Delivery Date was July 22, 2026, subject to any "Tenant Delay" (as defined in the Lease).

35.     Concurrently with Tenant's efforts to satisfy the Tenant Contingencies, Plaintiff was actively performing its obligations under the Lease, having incurred costs in excess of $227,333.76 in Design and Engineering work specifically tailored to Tenant's unique use and specifications.

10346085.v1

36.     Notwithstanding the foregoing, on or about February 26, 2026, Tenant's counsel communicated to Plaintiff that Tenant "feels it is best to disengage" and "absolutely wants to terminate" the Lease, without identifying any legitimate basis for termination or any failure by Plaintiff to perform its obligations under the Lease.

37.     In its letter to Tenant dated March 3, 2026, Plaintiff advised that Tenant's communications constituted a repudiation of the Lease. The letter demanded a written retraction of Tenant's repudiation within three (3) business days, and further demanded that Tenant provide clear and unambiguous assurance of its agreement to perform and honor all future Lease obligations.

38.     Plaintiff further advised Tenant in its March 3, 2026 letter that, in order to mitigate potential damages given the unique nature of Landlord's Work, Plaintiff was suspending all of its work pending receipt of such assurances.

39.     On March 5, 2026, Tenant's counsel responded to Plaintiff's March 3rd letter but did not retract Tenant's repudiation or provide any assurances of performance. To the contrary, the response confirmed that Tenant intended to disengage from the Lease and, for the first time, purported to place Plaintiff on notice of an alleged Landlord default – without identifying any specific Lease provision or obligation that Plaintiff had failed to perform.

40.     On March 10, 2026, Plaintiff replied, confirming that Tenant had committed an anticipatory breach of the Lease and rebutting Tenant's purported default notice as procedurally deficient and substantively without merit. Plaintiff further advised that it had incurred costs in excess of $225,000  for the Design and Engineering work uniquely tailored to Tenant's specific use and of little to no value for any alternative retail tenant or purpose, and that Tenant's exposure

- 8 -

extended well beyond those direct expenditures to include lost rent, re-leasing costs, and carrying costs.

41.     On March 12, 2026, Plaintiff's Director of Real Estate Leasing & Acquisition and Plaintiff's Senior Counsel participated in a call with Tenant's counsel. During the call, Tenant's counsel confirmed that Tenant's decision not to proceed with the Lease was purely a business decision driven by "changed market conditions."

42.     Specifically, Plaintiff was advised that a competing swim school had opened in the market since Tenant signed the Lease, and that Tenant's position was that it would be investing in a swimming pool that "no one would use."

43.     Plaintiff was further advised on the call that the project no longer made economic sense for Tenant from the perspectives of timing, cost, and market competition.

44.     Plaintiff again advised on the call that Tenant's exposure extended well beyond Plaintiff's Design and Engineering costs to date and included, without limitation, lost rent, re-leasing costs and carrying costs arising out of its performance of Landlord's Work, which would be in addition to the adverse impact on the Shopping Center resulting from an extended vacancy of the Demised Premises.

45.     Tenant's repudiation of the Lease and abandonment of the project constitutes a material breach of the Lease and default thereunder, including, without limitation, a breach of Section 2.4, pursuant to which Tenant was obligated to perform Tenant's Work, and Section 16.2(b) which provides that a default occurs when Tenant, whether by action or inaction, fails to perform any of its obligations under the Lease.

46.     The aforesaid facts and circumstances were also set forth in Plaintiff's letter to Tenant's counsel dated April 20, 2026.

10346085.v1

47.     In the April 20th letter, Plaintiff provided Tenant with one final opportunity to confirm that it would proceed with Tenant's Work and take occupancy of the Demised Premises for Tenant's Permitted Use following completion of Landlord's Work, and to advise Plaintiff of same within no more than seven (7) calendar days.

**D.  Plaintiff's Counsel Serves a Demand Letter on the Defendants**

48.     After the seven (7) calendar day period elapsed without a response, on April 29, 2026, Plaintiff's counsel served a demand on the Defendants to honor the full amount of Plaintiff's damages pursuant to the Guaranty of Lease.

49.     The Defendants were advised that if they failed or refused to respond within seven (7) days of receipt of the demand letter, Plaintiff intended to exercise all of its rights and remedies available under the Guaranty including commencement of legal proceedings against the Defendant.

50.     On May 27, 2026, more than six weeks after Plaintiff's April 20, 2026 letter and without any prior communication, Mr. Bevilacqua, Tenant's Director of Construction, sent an email to representatives of Plaintiff, as well as to Defendant Brian Gilbride, advising that Tenant was "preparing to release our RFP for contractor bid proposals for the Tenant construction work at the Orange location", with a pre-bid meeting tentatively planned for the end of June.

51.     On May 31, 2026, Mr. Bevilacqua sent a follow-up email requesting permission to access the Demised Premises on June 1 or June 2, 2026 for "pre-bid confirmation items" and requesting the lockbox code.

52.     Plaintiff's Director of Real Estate Leasing & Acquisition responded that Mr. Bevilacqua and Defendant Brian Gilbride should communicate with their attorney.

10346085.v1

53.    On June 1, 2026, Defendant Brian Gilbride sent an email to Plaintiff's Director of Real Estate Leasing & Acquisition purporting to invoke Sections 2.3 and 2.5 of the Lease as the basis for a right of access to the Demised Premises, and demanding that Plaintiff either confirm Tenant's right of entry or identify the specific Lease provision upon which Plaintiff relied to deny it.

54.    Tenant's May 27, 2026 and subsequent emails do not constitute a retraction of its anticipatory repudiation of the Lease, nor do they provide the clear and unambiguous assurance of performance that Plaintiff demanded.

55.    Furthermore, Tenant's May 27, 2026 and subsequent emails are entirely silent as to the admissions made by Tenant's counsel on the March 12th call – namely, that Tenant's decision not to proceed was purely a business decision driven by changed market conditions, including the entry of a competing swim school into the market, and that the project no longer made economic sense from the perspectives of timing, cost, and competition.

56.    Rather, Tenant's May 27, 2026 and subsequent emails, coming more than six (6) weeks after Plaintiff's April 20, 2026 letter and on the eve of litigation, constitute a transparent and belated attempt to manufacture a record of performance intent that is wholly inconsistent with Tenant's prior conduct and admissions.

57.    Accordingly, on June 2, 2026, Plaintiff sent a letter to the Tenant advising that Tenant's recent emails did not, *inter alia*, constitute a retraction of its repudiation or provide the unambiguous assurances of future performance as demanded by Plaintiff, and that Plaintiff considered Tenant's repudiation of the Lease to be final.

- 11 -

## COUNT I

### (Breach of the Guaranty)

58.     Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as if set forth fully herein.

59.     There exists a valid, enforceable Guaranty executed by Defendants pursuant to which Defendants jointly and severally guaranteed the full payment and performance of all obligations of Tenant under the Lease, including the payment of Fixed Annual Rent and Additional Rent, and the construction and completion of Tenant's Work.

60.     Tenant defaulted in the performance of its obligations under the Lease by repudiating the Lease and failing to perform its obligations thereunder after all Tenant Contingencies had been satisfied (as confirmed in writing by Tenant's own Director of Construction on January 22, 2026). Tenant's default is further evidenced by its counsel's admissions on the March 12th call, Tenant's consistent failure to retract its repudiation or provide any assurance of performance despite repeated demands, and Tenant's complete silence in response to Plaintiff's April 20, 2026 letter.

61.     Defendants, as Guarantors, have failed and refused to perform their obligations under the Guaranty, including their obligation to pay all Fixed Annual Rent and Additional Rent due and owing under the Lease and to perform all of Tenant's obligations thereunder, notwithstanding that the Guaranty is absolute, unconditional, and irrevocable and is enforceable directly against Defendants without the need for prior suit against Tenant or prior notice of default.

62.     Under Paragraph 19.1 of the Lease, the attorneys' fees incurred by Plaintiff in response to Tenant's default under the Lease shall be considered Additional Rent.

10346085.v1

63.    Paragraph 1(a) of the Guaranty provides, among other things, that Defendants are liable for Additional Rent, which includes the attorneys' fees incurred in this action and in response to Tenant's default.

64.    By virtue of the foregoing, Defendants are liable to Plaintiff in an amount to be determined at trial but not less than $1,979,518.91, together with interest, attorneys' fees, and costs as provided in the Lease and Guaranty.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

(1) Awarding Plaintiff compensatory damages in an amount to be determined at trial but not less than $1,979,518.91, together with consequential, incidental and/or special damages, plus pre- and post-judgment interest;

(2) Awarding attorneys' fees and costs of suit; and

(3) Granting such other and further relief as the Court deems just and equitable.

Dated:  June 3, 2026

Respectfully submitted,

By____/s/_ct02621_____
        Frederick J. Trotta of
        HALLORAN & SAGE LLP
        One Century Tower
        265 Church Street, Ste 802
        New Haven, CT 06510
        Federal Bar #: ct02621
        trotta@halloransage.com
        Attorneys for Plaintiff

- 13 -

10346085.v1